## H. F. McFarland v. William Parr & Co.

Decided January 18, 1904.

**Bond to Pay Freights—Liability Under—Estoppel.**

To secure dispatch in the loading of export cotton on their ships appellees executed to appellant, an agent of railways, a bond to secure him in the payment of freights for all cotton delivered at their ships' sides and loaded. Cotton was transported to various consignees in Galveston, and shipped on appellees' vessels and the freights due the railways paid thereafter, on demand by appellees. This was not always true of cotton consigned to D. & Co., a firm from which the appellant had not exacted prepayment of freights, a fact of which appellees were advised. The bill of one cargo of D. & Co. cotton shipped on their vessels was returned by appellees to railways indorsed that D. & Co. paid their own freight bills. Subsequently two cargoes of D. & Co. cotton were shipped on appellees' vessels, the freight bills of which were presented to D. & Co. and by them held up on questions of weights. Finally the appellant, as agent of the railways, withdrew the bills from D. & Co., who a few days later failed. The suit is against appellees on the bond, and the only issue submitted to the jury was that of estoppel in pais raised by the answer, and the verdict and judgment was for defendants, appellees here. On the whole case this court holds that under the bond the railways waived but the one right to hold the cotton for freights; that the bond covered all cotton received by the appellees for shipment; that estoppel does not apply, and that under the bond appellees were liable.

Appeal from the District Court of Galveston. Tried below before Hon. Wm. H. Stewart.

*J. A. Read* and *Lewis Fisher*, for appellant.

*James B. & Chas. J. Stubbs*, for appellees.

GILL, Associate Justice.—William Parr & Co. were agents and charterers of ships in the export carrying trade from Galveston, and as such handled large quantities of cotton in bales. It was to their interest that cotton brought into Galveston by the various railway lines and destined for their ships should be delivered at the ships' side as quickly as possible after arrival, the ships' agent being allowed a bonus for clearing a vessel within a given time, and penalized for detaining a vessel beyond it. To the end that the time required for the adjustment and payment of railway freight on such cotton might not interfere with its prompt delivery as desired by them, Parr & Co. induced the railway companies represented by McFarland, the appellant, to agree to deliver to them all cotton consigned to their ships without holding it for the freight due, in consideration of which agreement, and to secure the payment of such freight, Parr & Co. executed and delivered the following bond with sureties as indicated:

"State of Texas, County of Galveston. Know all men by these presents, that we, Wm. Parr and Joseph Clark, composing the firm of Wm. Parr & Company, as principals, and Adoue & Lobit, as sureties, are held and firmly bound to pay to H. F. McFarland, agent of the International & Great Northern Railroad Company, Galveston, Houston

& Henderson Railroad Company, and Missouri, Kansas & Texas Railway Company, as their interests may appear, and his successors, the sum of ten thousand dollars ($10,000); for the payment thereof, well and truly to be made, we bind ourselves, our heirs, executors, administrators and assigns.

"The condition of this obligation is such that if said Wm. Parr & Co. shall well and truly pay to H. F. McFarland, agent, when due, all freight charges on cotton for the carriage thereof from the initial point of shipment to the port of Galveston which may be delivered by the said H. F. McFarland, agent, to ships or vessels of which the said Wm. Parr & Co. are or may be agents, and for which the said H. F. McFarland, agent, may hold receipt of said Wm. Parr & Co., or their authorized agents, or some authorized agents of the ship or vessel, it being understood that the ship or vessel means either a vessel with sail or steam power, or both, and being the object and intent of this obligation to secure payment to H. F. McFarland, agent, of all freight charges due on cotton which may be delivered at any time in the future to such ships or vessels before the payment of such charge, then this obligation shall be void, otherwise remaining in full force and effect, it being the understanding that this obligation shall be continuing and shall cover and secure the payment of the freight charges on all such cotton, as hereafter may be delivered, until September 1, 1897, after which time they will no longer be bound thereby.

"Witness our hands and scrolls for seals, this 21st day of September, 1896.

"WM. PARR & COMPANY,<br>"ADOUE & LOBIT.

"W. F. McFarland."

Various Galveston firms, receiving cotton from the various railroads, shipped cotton in the Parr & Co. ships, and in pursuance of such agreement and bond, such cotton, though consigned to Galveston firms, would be delivered at once to Parr & Co. at the ships' side without prepayment of inland freight. The railway companies to which such freights might be due would thereafter present the freight bills to Parr & Co. and receive payment from them. This was true as to all the firms through which Parr & Co. received cotton except Dobson & Co. This latter firm handled not only export cotton but a large amount of local cotton. Prior to the execution of the bond in question the railway companies had not been requiring prepayment of the freight by Dobson & Co. before delivering freight to them. After the bond was executed the railway companies made no change in this respect, but made out its freight bills against Dobson & Co not only for the local cotton consigned to them but for the export cotton wherever delivered. That this course was pursued was known to Parr & Co., and on one occasion when a Dobson & Co. bill was presented to them they returned

it to the railway company with an indorsement to the effect that Dobson & Co. paid their own freight bills.

On the 20th day of December, 1896, the International & Great Northern Railway delivered to Parr & Co. certain cotton for export which had been consigned to Dobson & Co. It was loaded on the ship Mayfield which sailed that day. On the 24th day of said month and on the 25th day of said month other lots of Dobson & Co. export cotton were delivered to Parr & Co. These lots were loaded upon the steamship Knutsford which sailed for European ports on December 31, 1896. Bills were promptly presented to Dobson & Co. for the freight on each of the lots so delivered to Parr & Co., but Dobson & Co. raised some question about weights and thus postponed the payment of the bills. Finally the bills were withdrawn from Dobson & Co. by the agent of the railway company about the —— day of ——, and on December 31st Dobson & Co. failed.

On the 4th day of January, 1897, these uncollected bills were presented to Parr & Co. and payment of them demanded under the terms of the bond. Parr & Co. refused payment and the railway company, through its agent, McFarland, brought this suit against Parr & Co. and the sureties on their bond to recover the sum thus due on the Dobson & Co. cotton shipped on the Mayfield and Knutsford. It had been the custom of Parr & Co. to require of all other exporters payment of inland freight on issuance of marine bills of lading to them, but this course was not pursued with Dobson & Co. Parr & Co. could and would have secured themselves by requiring prepayment by Dobson & Co. in this case or by holding the cotton therefor had they known of their impending failure. One of the firm of Parr & Co. testifies they would not have allowed the cotton to leave the port before collection of inland freight had they known the railway company was looking to them, but it was also shown that Parr & Co. extended credit to Dobson & Co. and in some instances issued to them the marine bills of lading before the arrival of the cotton at Galveston, the marine bills being exchanged for the inland bills which had preceded the cotton to the port. It is also probable that had the agents of the railway company made a peremptory demand for the freight Dobson & Co. would have paid it before their failure, but, as stated before, the bills were held up to adjust the matter of weights.

It is agreed that the amount of freight due appellant by Dobson & Co. on the cotton shipped by the Mayfield and Knutsford in December, 1896, is $3854.

The defendants Parr & Co. pleaded general denial; that the bond did not cover cotton shipped by Dobson & Co., and further that the railway company by reason of the facts was estopped to claim that it did.

The only issue submitted to the jury was estoppel in pais. The verdict and judgment was for defendants and the plaintiff has appealed.

The controlling question was raised both by general demurrer to

defendant's answer and upon the sufficiency of the facts to sustain the plea. The question presented for our determination is the sufficiency of the facts to sustain the defense.

It is not questioned that the railway company had a lien upon cotton hauled over its line to secure the unpaid freight and might demand its payment as a condition to delivery. It also had a personal claim against the consignee. The acceptance of the bond and the agreement to deliver to Parr & Co., without payment of freight, whatever cotton they might order to their ships, was a waiver of but one right, and that was the right to hold the cotton for the freight. The proposition is too plain for argument that the railway company did not thereby surrender its right to collect from the consignee or to undertake first to collect from him. That the bond was designed to secure the freight upon the cotton ordered to the ships' side by Parr & Co. without reference to what firm it was consigned to can not be successfully questioned. The effort of the railway company in continuing to collect from Dobson & Co. and in making demand upon Parr & Co. only after default can be held to estop the railway only on the theory of appellee that it was the duty of appellant to notify appellees that the railway had not ceased to look to them as surety.

We do not consider this contention sound in any aspect of the case. The bond itself fixed the liability which was voluntarily assumed. In it the railway company undertook to do but one thing, and that was to deliver the cotton without prepayment of freight. It released no source of security save that. It did not undertake to make demand or serve notice. The demand for the bond was itself notice that the cotton would not be delivered as desired save for the obligation of the appellees. The bond was a provision against failure to pay, and to hold that it does not bind in this case would be to hold it practically nugatory. It seems to us it is rather to be inferred that if the appellees thought the railway had released them the duty devolved upon them to make sure by inquiry, for to presume that the railway would voluntarily release them was an unauthorized presumption, there being no consideration of interest to induce it to pursue such course, and the facts showing it was acting strictly within its right in all that it did.

We do not discuss the cases cited because the principles of estoppel involved here are simple and there is little disagreement as to the law. The controversy arises on the sufficiency of the facts and we are clear the issue of estoppel is not presented.

Appellee also contends that appellant's claim is barred by its delay in making demand after delivery of the cotton, and contends that their obligation to pay the freight when due imposed upon the company the duty to make demand at that time. A moment's thought will serve to disclose the fallacy of this contention. Except for the bond the freight was due before delivery. As to the consignee it was still due them. After delivery no due date was fixed, so that it is plain the due date

was not changed. The railway might demand it as soon after delivery as it pleased or, generally speaking, at any time thereafter within the period of limitation. Of course we do not mean to say there might not be facts attending a delay in enforcing the right which might defeat them. But the few days after final default as in this case is certainly insufficient.

We are of opinion the undisputed facts show liability.

The judgment of the trial court is therefore reversed and judgment is here rendered for appellant as prayed for.

*Reversed and rendered.*